**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ZACHARY CARLSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case number 4:12cv2007 AGF |
| | ) | TCM |
| CAROLYN W. COLVIN, Acting | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This 42 U.S.C. § 405(g) action for judicial review of the final decision of Carolyn W. Colvin, the Acting Commissioner of Social Security (Commissioner), denying the applications of Zachary Carlson for disability insurance benefits (DIB) under Title II of the Social Security Act (the Act), 42 U.S.C. § 401-433, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. § 1381-1383b, is before the undersigned United States Magistrate Judge for a review and recommended disposition pursuant to 28 U.S.C. § 636(b).

**<u>Procedural History</u>**

Zachary Carlson (Plaintiff) applied for DIB and SSI in February 2008, alleging he had become disabled on April 1, 2006, by post-traumatic stress disorder (PTSD), seizure disorder, mood disorder, and personality disorder. (R.[1] at 131-33, 136-39.) His applications were

---

[1]References to "R." are to the administrative record filed by the Commissioner with her answer.

denied initially and following a hearing held in October 2010 before Administrative Law Judge (ALJ) Bradley Hanan. (Id. at 7-19, 25-52, 62-67.) After considering additional evidence submitted by Plaintiff, see pages 26 to 27, infra, the Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-5.)

## **Testimony Before the ALJ**

Plaintiff, represented by counsel, and Gary Weimholt, M.S., C.D.M.S. (Certified Disability Management Specialist), testified at the administrative hearing. At the beginning of the hearing, Plaintiff amended his alleged disability onset date to December 6, 2006. (Id. at 188.)

Plaintiff testified he is single, has no children, and lives by himself in an apartment. (Id. at 34.) He completed the twelfth grade, and was in learning disabled classes. (Id. at 34, 42.)

Plaintiff started drinking alcohol at age six. (Id. at 41.) He stopped in January 2009. (Id.) He has been arrested for driving while intoxicated. (Id.) He was hospitalized twice in January 2009 for suicidal thoughts. (Id. at 43.) In December 2006, he began going to the Crider Center for treatment after his family became concerned about him. (Id. at 42.) He sees a psychiatrist once a month and also has a caseworker that helps him get to places he needs to be. (Id. at 44.)

During the day, Plaintiff sleeps or sits and listens to the radio. (Id. at 43.) On a bad day, he just sits. (Id.) He has one or to bad days approximately every two weeks. (Id.) He

spends approximately twelve hours a day sleeping. (Id. at 44.) He has difficulty comprehending books. (Id.) He cannot concentrate on household tasks and forgets appointments. (Id. at 44-45.)

Plaintiff does not have a valid driver's license. (Id. at 34.)

Plaintiff worked at a Moto Mart in 2007. (Id. at 36.) Because he was slow at stocking, he would switch with a co-worker and clean the parking lot. (Id.) He also waited on customers. (Id.) When he was let go from the job he was told he was too slow. (Id.) He worked in 2005, but could not recall for whom he had worked. (Id. at 36-37.) He also had worked for a service company answering the telephone and doing "light mechanical work." (Id. at 37.) He was fired from that job for tardiness. (Id.) He had worked for an automobile repair company, changing oil and putting on and rotating tires. (Id. at 38.) He left this job to work for Saint Louis Auto Auction. (Id.) And, he had worked in 2001 as a cook at Hardee's and in 2000 as a cook at Pizza Hut. (Id. at 38, 39.) He quit the job at Hardee's and could not recall why he left the job at Pizza Hut. (Id. at 39.) His other jobs include being a cashier at Auto Zone and a cook and stocker for another pizza restaurant. (Id.)

Mr. Weimholt classified Plaintiff's jobs as a fast food cook as unskilled and light, as a cashier as semiskilled and light or medium, and as a car mechanic as semiskilled and medium. (Id. at 45-46.) He was then asked by the ALJ to assume a hypothetical claimant of Plaintiff's age, education, and work experience who had no exertional limitations but was limited to simple, routine, repetitive tasks and to only occasional interaction with the public and co-workers. (Id. at 46.) Asked if this claimant could perform any of Plaintiff's past

relevant work, Mr. Weimholt replied that he could not.  (Id.)   There were, however, other jobs this claimant could perform, including jobs as packagers in production or warehouse situations, industrial cleaners, housekeeper cleaners, and vehicle cleaners.  (Id. at 47.)  These jobs would still be appropriate if the claimant could not perform any tandem tasks assigned with co-workers, if the claimant could have no interaction with the public, or if the claimant could have only casual and infrequent contact with co-workers throughout the workday.  (Id. at 47-48.)  If the claimant would miss three days of work in the unskilled job arena "due to treatment and potential episodic decompensation," the claimant would either need an accommodation or would be subject to dismissal.  (Id. at 48.)

Plaintiff's attorney asked Mr. Weimholt to assume a hypothetical claimant of Plaintiff's age, education, and work experience who had no physical limitations but had repeated episodes of deterioration or decompensation resulting in his withdrawal from a situation or in a deterioration of his ability to work.  (Id. at 49.)  This claimant also "would require much support and assistance in maintaining concentration and pace."  (Id.)  Mr. Weimholt replied that such a claimant could not perform Plaintiff's past relevant work or any other competitive employment.  (Id.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms completed as part of the application process, documents generated pursuant to Plaintiff's applications, records from health care and social service providers, and various assessments of his mental capabilities.

When applying for DIB and SSI, Plaintiff completed a Disability Report.  (Id. at 248-54.)  His impairments, see page one, supra, limit his ability to work by causing him problems dealing with people and by preventing him from working fast in stressful conditions.  (Id. at 249.)  He became unable to work because of these impairments on April 1, 2006.  (Id. at 249.)  He stopped working, however, on December 11, 2007, when his seasonal job was over.  (Id.)  He had completed special training in auto body work.  (Id. at 254.)

Plaintiff's community support worker, Sarah Maurer, M.A., completed a Function Report Adult – Third Party form on his behalf.  (Id. at 223-31.)  She had spent an hour a week for seven months doing such tasks with him as taking him to doctors' appointments, making sure he took his medications, and helping him find community resources.  (Id. at 223.)  She did not know how he spent his day.  (Id.)  She reported that his impairments resulted in decreased sleep and weird dreams.  (Id. at 224.)  His personal hygiene was bad.  (Id.)  He could do such yard work as mowing and landscaping.  (Id. at 225.)  Once he started a chore, he needed encouragement to finish it.  (Id.)  He had poor social skills.  (Id. at 227.)  His impairments adversely affected his abilities to understand, follow instructions, complete tasks, remember, concentrate, and get along with others.  (Id. at 228.)  He could pay attention for only five to ten minutes at a time without requiring redirection.  (Id.)  He did not handle changes in routine well.  (Id. at 229.)

Plaintiff completed a Disability Report – Appeal form after the initial denial of his applications.  (Id. at 269-75.)  He did not have any new illnesses or conditions since he had

completed the original disability report, nor had his illnesses or their symptoms become worse or better.  (Id. at 269-70.)

An earnings record for Plaintiff lists reportable earnings in 1995 to 2009.  (Id. at 152, 187.)  His highest annual earnings, $19,116,[2] were in 2005.  (Id.)  His lowest, $1,183, were in 2008.  (Id.)  In 2008, he had earnings in only one quarter; in 2007, he had earnings in only two quarters.  (Id.)

The relevant treatment records are summarized below in chronological order and begin with an initial assessment Plaintiff had in December 2006 for mental health services at the Crider Center for Mental Health (Crider Center).  (Id. at 337-43.)  He explained that he had been "stressing out," getting mad, and reportedly taking "things too seriously."  (Id. at 338.)  He felt tense when he was around his mother.  (Id.)  He did not have any suicidal or homicidal thoughts; he had had suicidal thoughts two years earlier and homicidal thoughts when he was fifteen years old.  (Id.)  At the time of the interview, he was not considered to be a danger to himself or others.  (Id.)  In the past, he had vandalized property and shoplifted.  (Id. at 338-39.)  He was easily frustrated, occasionally irritable, and had difficulty controlling his anxiety.  (Id. at 339.)  He occasionally felt hopeless and worthless and had no energy.  (Id.)  He had had no seizures since he was in the tenth grade.  (Id. at 339, 341.)  He had been physically abused by his father, with whom he had lived from 1985 until 1995.  (Id. at 339, 340.)  Plaintiff further reported that he had worked at National Tire and Battery until he was incarcerated and could not work there again because he did not have a driver's license.  (Id.

_____

[2]All amounts are rounded to the nearest dollar.

at 340.)  He smoked half a pack of cigarettes a day and began drinking alcohol at twenty-one years of age.  (Id. at 341.)  He had not had any alcohol abuse treatment.  (Id.)  On examination, Plaintiff was "fairly well groomed" and appropriately dressed.  (Id.)  His affect was blunted; his speech was occasionally delayed in rate and was normal in volume; his attitude was cooperative; his stream of thought was distracted and occasionally tangential; his thought content reflected feelings of worthlessness and hopelessness; his intellectual functioning was normal; his immediate, recent, and remote memory were fair, as was his judgment.  (Id.)  He was alert and oriented to time, place, and person.  (Id.)  He appeared to have "little insight into his mental health issues or needs."  (Id. at 342.)  He was diagnosed with generalized anxiety disorder, rule out social phobia and PTSD.  (Id. at 337.)  His current Global Assessment of Functioning (GAF) was 58.[3]  (Id.)  It was recommended he follow through with mental health treatment by seeing a psychiatrist and taking prescribed medications.  (Id. at 342.)

Subsequently, Plaintiff saw John Byrd, M.D., a psychiatrist with the Crider Center, on January 9, 2007.  (Id. at 355, 371.)  He reported he drank beer once a week and would occasionally drink a case of beer.  (Id. at 355, 371.)  Plaintiff was alert and oriented to time, place, and person; was cooperative; had fair eye contact and clear speech; had a fair mood

---

[3]"According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000) [DSM-IV-TR], the [GAF] is used to report 'the clinician's judgment of the individual's overall level of functioning,'" **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003), and consists of a number between zero and 100 to reflect that judgment, **Hurd v. Astrue**, 621 F.3d 734, 737 (8th Cir. 2010).  A GAF score between 51 and 60 indicates "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." DSM-IV-TR at 34 (emphasis omitted).

and mild anxiety; and had limited insight and judgment. (Id.) He was diagnosed with PTSD and anxiety disorder, not otherwise specified[4] (NOS), and prescribed Celexa.[5] (Id. at 356, 372.) His GAF was 60. (Id.)

When he saw Dr. Byrd in February, Plaintiff reported that getting away from his family would be helpful. (Id. at 354, 370.) Dr. Byrd noted Plaintiff continued to minimize his drinking. (Id.) Plaintiff further reported that the Celexa was not of much benefit. (Id.) His sleep was fair; his appetite was better. (Id.) His Celexa dosage was to be increased. (Id.) In March, Plaintiff told Dr. Byrd that the increased dosage of Celexa had been helpful. (Id. at 353, 369.) He had been drunk a few times since his last visit, and was advised to quit drinking and immediately start Alcoholics Anonymous (AA). (Id.) Dr. Byrd noted that he would recommend alcohol rehabilitation if Plaintiff continued to drink. (Id.)

When he saw Plaintiff in April, Dr. Byrd described his mood as fair and his speech as clear. (Id. at 352, 368.) Plaintiff was cooperative, but had limited insight and judgment. (Id. at 352, 368.) He had abstained from alcohol with one exception, i.e., he had drunk two

---

[4]According to the DSM-IV-TR, each diagnostic class, e.g., adjustment disorder, has at least one "Not Otherwise Specified" category. DSM-IV-TR at 4. This category may be used in one of four situations: (1) "[t]he presentation conforms to the general guidelines for a mental disorder in the diagnostic class, but the symptomatic picture does not meet the criteria for any of the specific disorders"; (2) "[t]he presentation conforms to a symptom pattern that has not been included in the DSM-IV but that causes clinically significant distress or impairment"; (3) the cause is uncertain; or (4) there is either insufficient data collection or inconsistent, contradictory information, although the information that is known is sufficient to place the disorder in a particular diagnostic class. Id.

[5]Celexa (citalopram) is prescribed for the treatment of depression. Celexa, http://www.drugs.com/celexa.html (last visited Jan. 13, 2014).

beers one night.  (Id.)  In May, Plaintiff informed Dr. Byrd that he had drunk one beer two weeks earlier and none since.  (Id. at 351, 367.)  His sleep, appetite, and mood were fair; his speech was clear; his insight and judgment were limited.  (Id.)  He was working at a pizza restaurant.  (Id.)

The next month, Plaintiff reported to Dr. Byrd that he was frustrated because he was getting very few work hours and had been mowing yards part-time.  (Id. at 350, 366, 413.)  On examination, he was as before.  (Id.)  His medication was continued.  (Id.)  In July, Plaintiff reported he had started a new job at Moto Mart.  (Id. at 349, 365, 412.)  Dr. Byrd noted that Plaintiff was not attending AA meetings and was minimizing his drinking.  (Id.)  His medication was continued.  (Id.)  Plaintiff was to have an appointment with community support services at Crider Center.  (Id.)

On August 6, Plaintiff had a community support services assessment at Crider Center.  (Id. at 325-36, 373-84.)  He was described as being dressed appropriately, but with "a slight body odor" and wearing unkempt clothes.  (Id. at 326, 333.)  He described his mood during the past six months "as normal, anxious, and depressed."  (Id. at 328.)  He was always irritable, but only occasionally angry.  (Id.)  His father, brother, and sister, now deceased, had drinking problems.  (Id. at 329.)  Plaintiff reported he began drinking when he was fourteen years old.  (Id. at 331.)  He currently drank approximately one six-pack a month.  (Id.)  He also reported he drank "'every 2 weeks or so . . . whenever [he] [got] paid."  (Id.)  The inconsistency was thought to be a possible indicator of Plaintiff minimizing his drinking.  (Id.)  He had not tried to quit drinking.  (Id. at 332.)  On examination, Plaintiff had normal

eye contact; normal speech, but a flat tone; an irritable, apathetic, disinterested, guarded, and evasive attitude; and a rapid and tangential stream of thought. (Id. at 333.) He occasionally displayed inappropriate anger. (Id.) He had difficulty concentrating, appeared to be distracted, and demonstrated feelings of worthlessness, indecisiveness, low self-esteem, and loss. (Id.) He appeared to be unmotivated and resistant to treatment. (Id.) He was diagnosed with chronic PTSD, alcohol abuse, and mood disorder, NOS. (Id. at 325, 334.) His current GAF was 51. (Id. at 325, 335.) In addition to following though with mental health treatment and attending AA meetings, it was recommended he find "a job well suited for his interests and abilities." (Id. at 335.)

The next day, Plaintiff informed Dr. Byrd that he had lost his job at Moto Mart because he was "'too slow.'" (Id. at 348, 364, 411.) Plaintiff reported he was good at working on cars, but did not have a driver's license. (Id.) The examination findings and diagnoses were as before. (Id.)

In September, Dr. Byrd discussed with Plaintiff the benefits of Risperdal,[6] which he then prescribed for Plaintiff in addition to the Celexa. (Id. at 347, 362, 410.) A notation made the same day by Sarah Fedor, M.A., C.S.W., reads that Plaintiff had worked for one week the past month but had been fired because he did not show up for work and did not call in. (Id. at 363.) He had had an argument with his mother after she confronted him about his alcohol use and he had denied such. (Id.)

---

[6]Risperdal is an antipsychotic medication prescribed to treat schizophrenia and symptoms of bipolar disorder. Risperdal, http://www.drugs.com/risperdal.html (last visited Jan 13, 2014).

When Plaintiff saw Dr. Byrd in October he smelled of alcohol. (Id. at 346, 361, 409.) Dr. Byrd noted that Plaintiff had poor insight and judgment. (Id.) He was referred to Bridgeway Behavioral Health (Bridgeway) for a treatment program; his prescriptions for Celexa and Risperdal were renewed. (Id.) Dr. Byrd noted at Plaintiff's November visit that Plaintiff had refused to go to an alcohol rehabilitation program and denied he had an alcohol problem. (Id. at 345, 360.) His prescriptions and Dr. Byrd's advice to go to rehabilitation were renewed. (Id.)

Plaintiff was counseled by Ms. Maurer, also at the Crider Center, while he was undergoing treatment with Dr. Byrd. She met with him on January 2, 2008, to discuss his mood and medication compliance. (Id. at 446-47.) He was taking the Celexa, but not the Risperdal. (Id. at 446.) He explained that the latter caused him bad dreams. (Id.) He was advised to discuss medication changes with Dr. Byrd. (Id.) He "was dressed appropriately but had questionable hygiene," and had a flat, disinterested affect. (Id.) He was to check-in at Bridgeway on January 7. (Id.)

On that day, an addiction severity index was completed for Plaintiff by the providers at Bridgeway. (Id. at 318-24.) He responded that he drank alcohol to intoxication and had problems with alcohol ten out of the past thirty days. (Id. at 320.) He had not abstained from alcohol for the past fourteen months. (Id.) Alcohol was rated as a considerable problem; treatment was considered to be necessary. (Id.) It was noted Plaintiff had been treated twice for alcohol abuse. (Id.) He had been arrested six times for shoplifting or vandalism, four times for parole or probation violations, and once for burglary, larceny, or breaking and

entering.  (Id. at 321.)  Eleven of these charges had resulted in convictions.  (Id.)  He had

been charged four times for driving while intoxicated and had been incarcerated for such

offense at least twice.  (Id.)  He had had twenty-two major driving violations.  (Id.)  In the

past thirty days, he had not had any serious conflicts with family members or other people.

(Id. at 323.)  Also, in the past thirty days, he had had problems with comprehension or

memory, but had not had problems with hallucinations or serious depression, anxiety, or

tension.  (Id. at 324.)  He had not had difficulty with violence control or had serious suicidal

thoughts or a suicide attempt.  (Id.)  He had had psychological problems, however, every day

for the past thirty days.  (Id.)

On January 29, Plaintiff informed Dr. Byrd that he had just completed two months at

Bridgeway and was staying with his mother.  (Id. at 344, 358, 407.)  His prescriptions were

renewed; he was to continue with rehabilitation.  (Id.)  Ms. Maurer noted the same day that

Plaintiff had been discharged from Bridgeway.  (Id. at 445.)  She, Dr. Byrd, and Plaintiff

discussed him applying for social security disability and Plaintiff looking for a job.  (Id.)  He

was dressed appropriately and had adequate hygiene.  (Id.)

On February 6, Ms. Maurer noted Plaintiff had applied for disability and was

attending Bridgeway outpatient program twice a week.  (Id. at 44.)  He had remained sober

since his discharge the previous week.  (Id.)  He was dressed appropriately, had adequate

hygiene, was cooperative, and had appropriate speech.  (Id.)  On February 13, Plaintiff

informed Ms. Maurer that he was taking his medications 80 percent of time and was

remaining sober.  (Id. at 443.)  His affect was normal; his hygiene was adequate.  (Id.)
Plaintiff was trying to find a job.  (Id.)

Two weeks later, Plaintiff reported to Dr. Byrd that he was having bad dreams and,
if he fell asleep during the day, having odd dreams.  (Id. at 405, 533.)  He occasionally had
less energy.  (Id.)  His sleep was good; his mood was "so so."  (Id.)  He had not yet found a
job.  (Id.)  His diagnoses included PTSD; alcohol dependence; affective disorder, NOS; and
personality disorder, NOS.  (Id.)  His  medications were renewed.  (Id.)  The same day, he
informed Ms. Maurer that his mood had improved and he was taking his medications daily.
(Id. at 406, 441.)  He was looking for a job so he could move out of his mother's house.  (Id.
at 406.)  His mother wanted him out of the house before she left for vacation.  (Id. at 441.)
He had applied for disability.  (Id. at 406.)  His hygiene had improved.  (Id.)

Ms. Maurer accompanied Plaintiff to a physical exam on February 27 and noted that
the exam showed him to be "in fairly good health."  (Id. at 440.)

When Plaintiff saw Ms. Maurer on April 7, she noted he was to begin work at a junk
yard in three days.  (Id. at 434.)  Four days later, he informed her he had not gotten the job
because he showed up the first day without any tools.  (Id. at 433.)  He was going to continue
looking for employment.  (Id.)  On April 18, Plaintiff told Ms. Maurer that he was taking his
medications but was missing some night doses. (Id. at 432.)

Four days later, Plaintiff saw Dr. Byrd, reporting that he was doing "alright."  (Id. at
403, 532.)  His medications and diagnoses were unchanged.  (Id.)  The same day, Ms. Maurer
reported Plaintiff was functioning well, had moved into his own apartment, and was looking

for work.  (Id. at 404, 431.)  He was regularly taking his morning medications, but was having difficulties remembering to take his night medications; they had discussed this with Dr. Byrd.  (Id.)  Plaintiff had some mood swings and irritability, but his mood was fairly stable.  (Id. at 404.)

On May 8, Plaintiff reported to Ms. Maurer that he was attending Bridgeway one day a week and taking his medications 85 percent of the time.  (Id. at 429.)  He was appealing the denial of his social security disability applications.  (Id.)

When Plaintiff saw Dr. Byrd on May 22, he informed him that he had been working on cars, attending Bridgeway, and remaining sober.  (Id. at 400, 531.)  His appetite was good; his sleep was fair; his anhedonia was less; his speech was good.  (Id.)  His insight and judgment were limited.  (Id.)  He had no new worries or complaints.  (Id.)  His medications and diagnoses were unchanged.  (Id.)  The same day, Ms. Maurer noted Plaintiff had been sober since January 2008.  (Id. at 401, 428.)  He had bizarre dreams and had started rambling to himself when frustrated or upset.  (Id. at 401.)  He took his medications approximately 85 percent of the time.  (Id.) She also noted that Plaintiff was "keeping busy during the day by working on cars with his friends, mowing lawns, and running errands."  (Id. at 428.)

The next week, Ms. Maurer noted that Plaintiff had applied for a job at a local gas station and was continuing to look for work.  (Id. at 427.)  He was remaining sober.  (Id.)  On June 4, she noted that Plaintiff was dressed appropriately; had adequate hygiene; had normal speech and eye contact; and appeared frustrated.  (Id.)  A few weeks later, Ms. Maurer noted

that Plaintiff had obtained automobile insurance and had licensed his car so he could drive to work.  (<u>Id.</u> at 424.)

On June 24, Plaintiff told Dr. Byrd he was remaining sober and regularly attending Bridgeway.  (<u>Id.</u> at 402, 557.)  He continued to work on cars with his friends.  (<u>Id.</u>)  Ms. Maurer separately noted that Dr. Byrd had not altered Plaintiff's medications as he appeared to be stable.  (<u>Id.</u> at 423.)

Ms. Maurer noted at her July meeting with Plaintiff that he was continuing to work on cars with a friend, but wanted to find steady employment.  (<u>Id.</u> at 420.)  He was dressed appropriately and had adequate hygiene.  (<u>Id.</u>)  His affect was flat; his speech and eye contact were normal.  (<u>Id.</u>)  Plaintiff also met with Dr. Byrd that day, reporting that he had missed a few medication doses but was feeling "'okay'" overall.  (<u>Id.</u> at 556.)  His medications and diagnoses were as before.

In August, Plaintiff reported to Dr. Byrd that he was having difficulties getting up and going to work.  (<u>Id.</u> at 555.)  He had had a temporary job working for a General Motors subcontractor, but had been laid off.  (<u>Id.</u>)  In September, Plaintiff told Dr. Byrd that things were going well.  (<u>Id.</u> at 554.)  He felt good on his medications.  (<u>Id.</u>)  He was painting a house for someone.  (<u>Id.</u>)  In October, Plaintiff informed Dr. Byrd that he wished he had a job.  (<u>Id.</u> at 552.)  Overall, he felt okay.  (<u>Id.</u>)  His insight and judgment were described as limited.  (<u>Id.</u>)

In November, Plaintiff's new caseworker, Dan Cooper, M.Ed., met with him at his apartment.  (<u>Id.</u> at 415.)  Plaintiff was making pizza at a restaurant in the evenings and

decorating the town's main street during the day.  (Id.)  He was hoping to get a better, full-time job.  (Id.)  He planned on saving money to get a hardship driver's license, which would then enable him to get a better job.  (Id.)

Plaintiff told Dr. Byrd at his December session that he had been in a good mood.  (Id. at 551.)  His sleep, appetite, and energy were good.  (Id.)  He had no new worries.  (Id.)  He was alert and oriented to time, place, and person.  (Id.)  His insight and judgment were limited.  (Id.)

A few weeks later, on December 31, Plaintiff was admitted to St. Joseph Health Center (St. Joseph) after expressing suicidal thoughts.  (Id. at 751-842, 845.)  He had been drinking twelve to eighteen beers a day after receiving his fifth driving while intoxicated charge.  (Id. at 772, 775.)  He had not taken his medications for the past two to three days.  (Id. at 772.)  And, he reported he still had symptoms of PTSD, although he could not identify which symptoms he was experiencing.  (Id.)  During his hospitalization, he received medication management, individual and group counseling, anger management, and behavior modification.  (Id. at 755.)  On January 6, 2009, it was considered safe to discharge him.  (Id. at 751, 755.)  His diagnoses were alcohol induced mood disorder, alcohol abuse, and depressive disorder, NOS.  (Id. at 755.)  His GAF was 50.[7]  (Id.)  His medications were Celexa and Risperdal.  (Id. at 781.)  He was to follow up with Dr. Byrd as soon as possible and with Bridgeway for chemical dependency treatment.  (Id. at 782.)

---

[7]A GAF score between 41 and 50 is indicative of "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." DSM-IV-TR at 34 (emphasis omitted).

While Plaintiff was in St. Joseph, Mr. Cooper met with him. (Id. at 462.) Plaintiff explained that "his brother had coerced him into drinking and made him feel guilty about family problems." (Id.) Plaintiff had then telephoned Bridgeway, admitted to suicidal thoughts, and had been kept on the line until picked up to be taken to the hospital. (Id.) Plaintiff dismissed the significance of the suicidal thoughts. (Id.)

Two weeks after being discharged from St. Joseph, on January 19, Plaintiff was taken there again and was then transferred to St. Mary's Health Center (St. Mary's) after reporting to emergency medical technicians that he was contemplating suicide and had been "drinking a lot." (Id. at 631-748, 846-71.) Little Ceasars was listed as his employer. (Id. at 631.) After being treated with medications and attending group therapy sessions, Plaintiff was discharged on January 27 with diagnoses of bipolar affective disorder, type I mixed without psychosis; alcohol dependence; and personality disorder, NOS with dependency traits. (Id. at 644.) His GAF was 50. (Id.) On discharge, he was alert and oriented to time, place, and person; was not in acute distress; had a good mood; had fair insight and judgment; and had a goal-oriented thought process. (Id.) His medications included Campral,[8] Depakote,[9] and Celexa. (Id.) He was to follow up with his psychiatrist and refrain from drinking alcohol. (Id. at 645.)

---

[8]Campral (acamprosate) "is used to help a person who has recently quit drinking continue to choose not to drink." Campral, http://www.drugs.com/mtm/campral.html (last visited Jan. 13, 2014).

[9]Depakote is prescribed for the "[a]cute treatment of manic or mixed episodes associated with bipolar disorder, with or without psychotic features." Physicians' Desk Reference, 425 (65th ed. 2011) (PDR).

The same day, Plaintiff saw Dr. Byrd and reported having being admitted to St. Mary's.  (<u>Id.</u> at 546.)  His prescription for Risperdal was discontinued; a prescription for Depakote was added.  (<u>Id.</u>)

Plaintiff saw Dr. Byrd again in February and discussed being abused when thirteen and a friend trying to sexually abuse him when twelve.  (<u>Id.</u> at 545.)

In April, Mr. Cooper met with Plaintiff at the jail where Plaintiff was incarcerated.  (<u>Id.</u> at 455.)  Plaintiff "appeared to be experiencing minimal stress, considering the circumstances, but seemed frustrated by not knowing more about what was going on . . . ."  (<u>Id.</u>)

Plaintiff was released from jail on May 1.  (<u>Id.</u> at 454.)  Five days later, Mr. Cooper took him to get a breathalyzer that Plaintiff would have to use when it randomly went off.  (<u>Id.</u> at 453.)

On May 12, Plaintiff informed Dr. Byrd that he felt fine, but was concerned about earning money to pay for storage for his belongings when he was in jail.  (<u>Id.</u> at 544.)  Abilify[10] was added to his prescriptions.  (<u>Id.</u>)  On June 9, Plaintiff told him he was facing jail time due to a driving under the influence.  (<u>Id.</u> at 543.)

In July, Mr. Cooper met with Plaintiff at jail.  (<u>Id.</u> at 449, 502.)  Plaintiff informed him he would be incarcerated until August 11.  (<u>Id.</u>)

---

[10]Abilify is an antipsychotic medication used in the treatment of bipolar disorder.  <u>PDR</u> at 3459.

On August 31, Plaintiff had an annual community support services assessment at Crider Center.  (Id. at 465-79.)  Plaintiff reported he had voluntarily turned himself in on a driving while intoxicated (DWI) charge and had served approximately two months in jail that summer.  (Id. at 466.)  He had been sleeping well, typically getting between eight and nine hours of sleep a night, and had been occasionally irritable when people came over to talk with his friend when they were working on cars.  (Id. at 467.)  His energy level was less.  (Id.) He had not been depressed, but had been having some mood swings.  (Id.)  He had not engaged in any property damage and did not engage in theft or set fires, all of which he had described in a previous assessment.  (Id. at 466, 467.)  He had been hospitalized twice for psychiatric reasons, including once for a week in January 2009 when he was not taking his medication as prescribed and again that same month when his medications were changed. (Id. at 469.)  During the past winter, he had averaged twelve beers a day three to four days a month for four months.  (Id. at 473.)  He had last had a physical exam in 1994 or 1995.  (Id. at 474.)  His current medications included Depakote, Celexa, and Abilify.  (Id. at 475.)  A diagnosis of PTSD was considered appropriate due to the abuse Plaintiff had experienced from his father when growing up.  (Id. at 477.)  A diagnosis of alcohol abuse was considered appropriate "[d]ue to recurrent negative consequences of his alcohol use, including incarceration, losing his license, and several thousand dollars in fines."  (Id.)  A diagnosis of mood disorder, NOS, was considered appropriate due to Plaintiff's previous reports of being depressed, denials of feeling sad or grieving over his sister's death while also listing it as a presenting problem, difficulties concentrating, irritability, and feelings of fatigue.  (Id.)  A

diagnosis of personality disorder, NOS, was appropriate based on Plaintiff's prior assessment. (Id.)  His current GAF was 51.  (Id. at 478.)  It was recommended he pursue mental health treatment and find a suitable job.  (Id.)

Plaintiff reported to Dr. Byrd on September 8 that he had been locked up in county jail and had missed two doses of Abilify.  (Id. at 542.)  The next day, he informed Mr. Cooper during a meeting that "he was doing well, but was wanting to find employment."  (Id. at 500.)

Dr. Byrd discussed Plaintiff's medication compliance with him in October.  (Id. at 541.)  Plaintiff described his sleep and appetite as sporadic.  (Id.)  He was hoping to participate in drug court on charges of driving under the influence (his fifth such charge), driving while his license was suspended, and driving without insurance.  (Id.)  He had already done jail time for a sixth driving under the influence charge.  (Id.)  Dr. Byrd described Plaintiff's insight and judgment as poor.  (Id.)

Plaintiff reported to Dr. Byrd in December that he was compliant with his medications.  (Id. at 540.)  His insight and judgment were described as fair, as was his mood. (Id.)

Plaintiff missed his January 2010 appointment with Dr. Byrd.  (Id. at 539.)

Also that month, Mr. Cooper assisted him with contacting the Social Security Administration about a hearing and in applying for a job at a local retirement community. (Id. at 482.)

In February, Plaintiff described his status to Dr. Byrd as being "'not so good, not so bad.'" (<u>Id.</u> at 538.) He was taking "most" of his medications. (<u>Id.</u>) His sleep was good; his appetite was fair. (<u>Id.</u>) He had been sober for a year. (<u>Id.</u>) On examination, he was cooperative and had clear speech and good eye contact. (<u>Id.</u>) His insight and judgment were poor. (<u>Id.</u>)

At his March meeting with Dr. Byrd, Plaintiff's mood was fair, his attitude was cooperative, and his insight and judgment were poor. (<u>Id.</u> at 537.) His diagnoses and prescriptions were unchanged. (<u>Id.</u>)

Plaintiff informed Dr. Byrd at his April meeting that his new job was stressful. (<u>Id.</u> at 536.) On examination, he was as before. (<u>Id.</u>) The following week, Plaintiff told Mr. Cooper that he had quit his job "due to his employer's unreliability." (<u>Id.</u> at 517.) "[O]ther potential job opportunities" were discussed. (<u>Id.</u>) A few days later, Plaintiff met with Justin Flippin, M.A., a counselor at the Crider Center. (<u>Id.</u> at 513.) Plaintiff discussed with him his father's physical abuse and reported that he had been sexually abused by his father's friend when he was twelve or thirteen years old. (<u>Id.</u>) Mr. Flippin described Plaintiff as presenting with a flat affect, but being in a good mood despite the subject of their discussion. (<u>Id.</u>)

At their next four meetings, Mr. Flippin described Plaintiff as being in a good mood with a full affect and fully oriented. (<u>Id.</u> at 507, 510, 511, 513, 516.) Plaintiff "did not appear to be under the influence of any mood altering chemicals." (<u>Id.</u>)

In May, Plaintiff complained to Dr. Byrd of having been depressed for one day until the weather warmed up. (<u>Id.</u> at 535.) Two days later, he reported to a Crider Center case

worker, Jennifer Campbell, L.P.C., that the bad weather had caused an increase in his depression and that he was "busy helping out at his apartment complex for money off his rent."  (<u>Id.</u> at 505.)

In June, Plaintiff expressed concern to Dr. Byrd about possibly missing a drug court appointment and going to jail.  (<u>Id.</u> at 534.)  He had missed a urine drug screen and had had to spend a night in jail.  (<u>Id.</u>)  On examination, he was alert and oriented to time, place, and person.  (<u>Id.</u>)  He had no suicidal or homicidal ideations.  (<u>Id.</u>)  His speech was clear; his insight and judgment were poor.  (<u>Id.</u>)  His diagnoses were PTSD, alcohol dependence, and major depression.  (<u>Id.</u>)  His prescriptions for Abilify, Celexa, and Depakote were renewed. (<u>Id.</u>)

In July, Plaintiff discussed with Mr. Flippin his difficulties with finding a job when he did not have a driver's license.  (<u>Id.</u> at 564.)  Also that month, he reported to Dr. Byrd that he was doing well in AA and had occasional anxiety, but no complaints.  (<u>Id.</u> at 608-09.)

In August, Plaintiff underwent an annual community support services assessment at the Crider Center.  (<u>Id.</u> at 611-19.)  He reporting having difficulty getting to sleep and in waking up periodically during night.  (<u>Id.</u> at 612.)  He described his mood as being down, but not sad or depressed, "mostly related to interpersonal difficulties."  (<u>Id.</u>)  He reported a friend of his father's had masturbated him when he was ten or eleven and a friend of his had tried to abuse him when he was twelve or thirteen.  (<u>Id.</u> at 613.)  He would like to be employed, and wanted a job where management understood he was "'kind of slow.'"  (<u>Id.</u> at 614.)  He could do chores.  (<u>Id.</u>)  His diagnoses were PTSD, alcohol abuse, and mood disorder, NOS.

(Id. at 618.)  It was thought that a more appropriate diagnosis than mood disorder would be bipolar disorder based on Plaintiff's "cycling between depression and mania and severe irritability."  (Id. at 617-18.)  His current GAF was 70,[11] as was his highest GAF during the past year.  (Id. at 618.)

Dr. Byrd's notes of his September meeting, and those of subsequent meetings, were in a checklist format.  (Id. at 606-07.)  Plaintiff reportedly had too many things going on and could not get anything done.  (Id. at 606-07.)  He was going to all required meetings.  (Id. at 606.)  His Abilify dose was to be increased.  (Id.)  His diagnoses were PTSD and alcohol dependence.  (Id. at 607.)

The next month, Plaintiff discussed with Mr. Flippin difficulties he was having sleeping at night and being sleepy in the morning.  (Id. at 604.)  He had also had "random 'tingling' sensations" that he feared might be connected to a past diagnosis of epilepsy.  (Id.)  He was to graduate from drug court in two weeks.  (Id.)

Also before the ALJ were assessments by examining and nonexamining consultants of Plaintiff's mental abilities and limitations.

In March 2008, a Psychiatric Review Technique form was completed for Plaintiff by a non-examining consultant, Judith McGee, Ph.D.  (Id. at 388-99.)  Plaintiff was described as having an affective disorder, NOS; an anxiety-related disorder, i.e., PTSD; a personality disorder, NOS; and a substance addiction disorder, i.e., alcohol dependence.  (Id. at 388, 391,

---

[11]A GAF score between 61 and 70 indicates "[s]ome mild symptoms (e.g., depressed mood and mild insomnia) OR some difficulty in social, occupational, or school functioning (e.g., occasional truancy, or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships."  DSM-IV-TR at 34 (emphasis omitted).

392, 393, 394.)  These disorders resulted in Plaintiff experiencing mild restrictions in his activities of daily living, mild difficulties in social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  (Id. at 396.)  There was insufficient evidence from which to determine whether the disorders had caused repeated episodes of decompensation of extended duration.  (Id.)

On a Mental Residual Functional Capacity Assessment, Dr. McGee assessed Plaintiff as being moderately limited in his ability to understand and remember detailed instructions and not being significantly limited in any of the other two abilities in the area of understanding and memory.  (Id. at 385)  In the area of sustained concentration and persistence, Plaintiff was moderately limited in one of the eight listed abilities, i.e., his ability to carry out detailed instructions, and was not significantly limited in the remaining seven abilities.  (Id. at 385-86.)  In the area of social interaction, Plaintiff was not significantly limited in all five abilities.  (Id. at 386.)  In the area of adaptation, Plaintiff was not significantly limited in one of the four listed abilities and was markedly limited in the other three:  his ability to be aware of normal hazards and take appropriate precautions; his ability to travel in unfamiliar places or use public transportation; and his ability to set realistic goals or make plans independently of others.  (Id.)

On an undated questionnaire, Dr. Byrd reported Plaintiff had difficulties in understanding and remembering instructions and in sustaining concentration and persistence int asks.  (Id. at 357.)  He also had poor social skills.  (Id.) Plaintiff's diagnoses were PTSD,

affective disorder, NOS, and alcohol dependence.  (Id.)  Dr. Byrd had last seen Plaintiff in January 2008.  (Id.)

**The ALJ's Decision**

The ALJ first determined that Plaintiff met the insured status requirement of the Act through September 30, 2012, and had not engaged in substantial gainful activity since his amended alleged disability onset date of December 6, 2006.  (Id. at 13.)  He next determined that Plaintiff had severe impairments of PTSD, generalized anxiety disorder, and personality disorder.  (Id.)  These impairments, singly or combined, did not meet or medically equal an impairment of listing-level severity.  (Id.)  Noting, inter alia, that Plaintiff reported in June 2008 that he was doing alright and planned to return to work and was working on cars the following month, the ALJ assessed Plaintiff as having mild restrictions in his activities of daily living and mild difficulties in social functioning.  (Id. at 13-14.)  He had moderate difficulties in concentration, persistence, or pace.  (Id. at 14.)  He had had no episodes of decompensation.  (Id.)

The ALJ then determined that Plaintiff had the residual functional capacity (RFC) to perform a full range of work at all exertional levels but was limited to work involving only simple, routine, and repetitive tasks with no interaction with the public and only casual and infrequent contact with co-workers.  (Id.)  He followed this RFC with a summary of the medical records.  (Id. at 15-18.)  With his RFC, however, Plaintiff was unable to perform any past relevant work.  (Id. at 18.)  With his age, education, and RFC, he could perform jobs as described by the vocational expert.  (Id. at 18-19.)

Plaintiff was not, therefore, disabled within the meaning of the Act.  (Id. at 19.) Because he was not disabled, the ALJ considered an examination of his alcohol intake to be unnecessary.[12]

## Additional Records Before the Appeals Council

After the ALJ rendered his adverse decision, Plaintiff's counsel submitted approximately 160 pages of Crider Center records to the Appeals Council.  The majority of these records were also before the ALJ.  The exception was a July 2010 Residual Functional Capacity completed for Plaintiff by Dr. Byrd.[13]  (Id. at 884-88.)  Plaintiff's diagnoses were PTSD, major depression, and alcohol dependence; his GAF was 50.  (Id. at 884.)  His prognosis was fair if he complied with and responded to his medications.  (Id.)  On the checklist format of the form, Dr. Byrd marked depression and anger as manifestations of Plaintiff's emotions.  (Id.)  Other symptoms included pervasive loss of interest, persistent anxiety, poor commonsense judgment, and feelings of guilt and worthlessness.  (Id.)  Of the twenty-five abilities listed – sixteen in the category of mental abilities and aptitude needed to do unskilled work; four in the category of mental abilities and aptitude needed to do semi-skilled work and skilled work; and four in the category of mental abilities and aptitude needed to do particular types of jobs – Plaintiff was rated as having a fair ability, i.e., his

---

[12]Plaintiff's alcohol intake would have to have been examined if he had been found to be disabled without considering such.  See 20 C.F.R. §§ 404.1535 (describing process to be followed if there is medical evidence of alcoholism), 416.935 (same).

[13]Plaintiff argues that Dr. Byrd's assessment was submitted to the ALJ within the time allowed him by the ALJ.  Because, as discussed below, the assessment was would not have affected the ALJ's decision, a failure by the ALJ to address it is not prejudicial.

ability was "seriously limited, but not precluded" – in each.  (Id. at 885.)  He had no limitations in his restriction of activities of daily living and slight difficulties in maintaining social functioning.  (Id. at 886.)  He often had deficiencies of concentration, persistence, or pace.  (Id.)  He had had one episode of deterioration or decompensation.  (Id.)  Specifically, in respect to social functioning, Plaintiff had marked difficulties in exhibiting social maturity, cooperating with others, getting along with family, and communicating clearly and effectively.  (Id. at 887.)  He often tried to manipulate others.  (Id.)  In respect to concentration, persistence, or pace, Plaintiff withdrew from situations, exacerbated his symptoms, and had a long history of poor work performance.  (Id.)  His impairments had lasted more than twelve months.  (Id. at 888.)  His symptoms would frequently interfere with concentration and attention.  (Id.)  He would be expected to miss three or more days of work each month.  (Id.)  Dr. Byrd noted that Plaintiff frequently forgot appointments and was disorganized.  (Id.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death.  42 U.S.C. § 423(d)(1).  Not only the impairment, but the inability to work caused by the impairment must last, or be expected to last, not less than twelve months.  **Barnhart v. Walton**, 535 U.S. 212, 217-18 (2002).  Additionally, the impairment suffered must be "of such severity that [the claimant] is not only unable to do his

previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether . . . a specific job vacancy exists for him, or whether he would be hired if he applied for work."  42 U.S.C. § 423(d)(2)(A).

"The Commissioner has established a five-step 'sequential evaluation process' for determining whether an individual is disabled.'" **Phillips v. Colvin**, 721 F.3d 623, 625 (8th Cir. 2013) (quoting <u>Cuthrell v. Astrue</u>, 702 F.3d 1114, 1116 (8th Cir. 2013) (citing 20 C.F.R. §§ 404.1520(a) and § 416.920 (a)).  "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 n.3 (8th Cir. 2006).  First, the claimant cannot be presently engaged in "substantial gainful activity." <u>See</u> 20 C.F.R. §§ 404.1520(b), 416.920(b); **Hurd**, 621 F.3d at 738.  Second, the claimant must have a severe impairment. <u>See</u> 20 C.F.R. §§ 404.1520(c), 416.920(c). A "severe impairment" is "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." <u>Id.</u>

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. <u>See</u> 20 C.F.R. §§ 404.1520(d), 416.920(d) and Part 404, Subpart P, Appendix 1.  If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Bowen v. City of New York**, 476 U.S. 467, 471 (1986); **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009). "[A]n RFC determination must be based on a claimant's ability 'to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world.'" **McCoy v. Astrue**, 648 F.3d 605, 617 (8th Cir. 2011) (quoting Coleman v. Astrue, 498 F.3d 767, 770 (8th Cir. 2007)). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887); accord **Partee v. Astrue**, 638 F.3d 860, 865 (8th Cir. 2011).

"'Before determining a claimant's RFC, the ALJ first must evaluate the claimant's credibility.'" **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007) (quoting Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002)). This evaluation requires the ALJ consider "'[1] the claimant's daily activities; [2] the duration, frequency and intensity of the pain; [3] precipitating and aggravating factors; [4] dosage, effectiveness and side effects of medication; [5] functional restrictions.'" **Id.** (quoting Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). "The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting Pearsall, 274 F.3d at 1218). After considering the Polaski factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Ford**

**v. Astrue**, 518 F.3d 979, 982 (8th Cir. 2008); **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. §§ 404.1520(e), 416.920(e). The burden at step four remains with the claimant to prove his RFC and establish he cannot return to his past relevant work. **Moore**, 572 F.3d at 523; accord **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If, as in the instant case, the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Pate-Fires v. Astrue**, 564 F.3d 935, 942 (8th Cir. 2009); **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. §§ 404.1520(f), 416.920(f). The Commissioner may meet her burden by eliciting testimony by a VE, **Pearsall**, 274 F.3d at 1219, based on hypothetical questions that "'set forth impairments supported by substantial evidence on the record and accepted as true and capture the concrete consequences of those impairments,'" **Jones v. Astrue**, 619 F.3d 963, 972 (8th Cir. 2010) (quoting Hiller v. S.S.A., 486 F.3d 359, 365 (8th Cir. 2007)).

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting Finch v. Astrue, 547 F.3d 933, 935 (8th Cir. 2008)); accord **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001).  "'Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion.'" **Partee**, 638 F.3d at 863 (quoting Goff v. Barnhart, 421 F.3d 785, 789 (8th Cir. 2005)).  When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision.  **Moore**, 623 F.3d at 602; **Jones**, 619 F.3d at 968; **Finch**, 547 F.3d at 935.  The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730.

### Discussion

Plaintiff argues that the ALJ erred by failing to consider Dr. Byrd's 2010 assessment of his RFC and that the case should be remanded for the assessment to be considered by the ALJ and by the agency's medical consultant.  The Commissioner disagrees.

"Generally, '[a] treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence.'" **Renstrom v. Astrue**, 680 F.3d 1057, 1064 (8th Cir. 2012) (quoting Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011)) (second

alteration in original). "However, '[a] treating physician's opinion does not automatically control, since the record must be evaluated as a whole.'" **Id.** (quoting <u>Perkins</u>, 648 F.3d at 897). Rather, "'[a]n ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'" **Id.** (quoting <u>Perkins</u>, 648 F.3d at 897–98).

Dr. Byrd was Plaintiff's treating psychiatrist. In July 2010, he listed three diagnoses for Plaintiff: PTSD, major depression, and alcohol dependence. In February 2011, the ALJ found Plaintiff had three severe impairments: PTSD, generalized anxiety disorder, and personality disorder. Plaintiff does not argue that the differences in the second and third psychiatric diagnoses are of significance. Indeed, any such argument would be unavailing. Plaintiff's medical records, including those of Dr. Byrd, include varying psychiatric diagnoses. The issue is the functional limitations caused by Plaintiff's symptoms of his mental illnesses.

Dr. Byrd opined that Plaintiff's symptoms resulted in no restrictions in his activities of daily living. The ALJ determined that Plaintiff had mild restrictions in his activities of daily living. There is no prejudice to Plaintiff from the ALJ's more severe assessment.

Dr. Byrd opined that Plaintiff's symptoms resulted in slight difficulties in his social functioning. The ALJ determined that Plaintiff had mild difficulties in social functioning. "Social functioning refers to [a claimant's] capacity to interact independently, appropriately, effective, and on a sustained basis with other individuals." 20 C.F.R. Pt. 404, Subpt. P, App'x

1, § 12.00(C)(2) (emphasis omitted). "Social functioning in work situations may involve interactions with the public, responding appropriately to persons in authority (e.g., supervisors), or cooperative behaviors involving coworkers." Id. An ALJ is to rate the degree of limitation in social functioning caused by a mental impairment as none, mild, moderate, marked, or extreme. 20 C.F.R. § 404.1520a(c)(4). Dr. Byrd was to rate the degree of limitation in social functioning as none, slight, moderate, marked, or extreme. (See R. at 886.) Thus, the ALJ and Dr. Byrd were each given five degrees of severity to assign to the limitations caused by Plaintiff's mental illness on his social functioning and each rated that limitation as the next to least severe. When asked to indicate which of twelve areas in social functioning Plaintiff had difficulties with, Dr. Byrd checked four: exhibiting social maturity, cooperating with others, getting along with family, and communicating clearly and effectively. The form did not ask that the degree of difficulty experienced be assessed. He did not check the other eight areas, including avoiding altercations, responding to those in authority, or showing consideration for others. In addition to there being no difference in the two assessments of the degree of severity caused by Plaintiff's mental illness on his social functioning, the ALJ's RFC findings do accommodate difficulties in this area. He is limited to no interaction with the public and only causal, infrequent contact with coworkers.

Nor do the ALJ and Dr. Byrd significantly disagree about the extent to which Plaintiff's mental illness cause him difficulties in concentration, persistence, or pace. The ALJ found the limitation to be moderate; Dr. Byrd found Plaintiff often had such difficulties. "Concentration, persistence, or pace refers to the ability to sustain focused attention and

concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." 20 C.F.R. Pt. 404, Subpt. P., App'x 1, § 12.00(C)(3). The ALJ was to rate Plaintiff's limitations in this area as none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). Dr. Byrd was to rate the limitations as never, seldom, often, frequent, or constant. (See R. at 886.) Thus, the ALJ and Dr. Byrd each found the degree of limitation to be the middle of their five choices. And, as with social functioning, the ALJ accommodated Plaintiff's limitations in this area in his RFC findings. He limited Plaintiff to work consisting only of simple, routine, and repetitive tasks.[14]

Plaintiff correctly notes that the ALJ did not reference or discuss Dr. Byrd's July 2010 assessment in his decision. The Appeals Council did reference it, specifically stating that the exhibit in which it was included was considered. The Appeals Council is required to review a case if it finds, after evaluating the entire record, including new evidence, e.g., Dr. Byrd's assessment, that an ALJ's decision was "contrary to the weight of the evidence currently of record." 20 C.F.R. § 404.970(b). Therefore, the Appeals Council's decision not to review the ALJ's decision reflects a determination that the assessment did not tip the scales in favor of a finding of disability.

## Conclusion

For the reasons set for above, the Appeals Council's decision and the underlying decision of the ALJ is supported by substantial evidence on the record as a whole, including

---

[14]Dr. Byrd also described Plaintiff has having a history of poor work performance. The Court notes that this history occurred during a period when Plaintiff was drinking.

Dr. Byrd's 2010 assessment. "If substantial evidence supports the ALJ's decision, [the Court] [should] not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because [the Court] would have decided differently." **Wildman v. Astrue**, 596 F.3d 959, 964 (8th Cir. 2010). Accordingly,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be AFFIRMED and that this case be DISMISSED.

The parties are advised that they have **fourteen days** in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  21st  day of January, 2014.